IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIBRIL DALLAS SALAMI, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:22-CV-01709-M-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claim for Social Security Income (SSI) under Title XVI of the Social Security Act (the Act) should be **REVERSED** and **REMANDED** for further administrative proceedings.

## I.    BACKGROUND

Jibril Dallas Salami (Plaintiff) filed his application for SSI on June 12, 2019, alleging disability beginning May 21, 2008. (R. at 318.)[2] His claim was denied initially on August 21, 2019, and upon reconsideration on November 12, 2019. (R. at 107-13, 115-22.)[3] After requesting a hearing before an Administrative Law Judge (ALJ), he appeared and testified at a telephonic hearing on November 20, 2020. (R. at 32-73.) Following the hearing, the ALJ requested additional vocational testimony, which was proffered to Plaintiff; his attorney also requested additional

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] The background information is summarized from the record of the administrative proceedings, which is designated as "R." (*See* docs. 13-1, 13-2, 13-3.) Citations to the record refer to the page numbers at the bottom of each filing, however, citations to the parties' filings refer to the CM/ECF system page number at the top of each page.

[3] On October 31, 2020, Plaintiff moved to amend his alleged onset date to October 30, 2006. (R. at 347.) His motion was denied at the administrative hearing on November 10, 2020. (R. at 42.)

vocational testimony, the request was denied, and the ALJ scheduled a supplemental hearing. (R. at 13, 80, 258-59, 467-77.) Plaintiff objected to the denial of his request for additional vocational testimony and to a supplemental hearing. (R. at 261-62.)

On October 14, 2021, Plaintiff appeared at a telephonic supplemental hearing, at which the ALJ ruled on his objections. (R. at 80-84.) On November 26, 2021, the ALJ found that Plaintiff had not been disabled since June 12, 2019, the date he filed his application. (R. at 13-22.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on January 21, 2022. (R. at 315-16.) The Appeals Council denied his request for review on June 7, 2022, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A. Age, Education, and Work Experience

Plaintiff was born on October 31, 1984; he was 36 years old at the time of the hearing. (R. at 44, 318.) He had completed two years of college and had no past relevant work. (R. at 356.)

## B. Psychological and Psychiatric Evidence[4]

Plaintiff had a psychiatric history, including four hospitalizations between 2001 and 2002. (R. at 1134.) On May 1, 2019, he presented in-person to Metrocare Services (Metrocare), stating that he was "doing good", his medications had helped, and he had not run out of medication despite his last visit being in April 2018. (R. at 1134-36.) He walked with crutches due to an ankle injury and had been living at a homeless shelter since April 2, 2019. (R. at 1394.) He was alert, oriented times three, cooperative, and adequately groomed; he had fair judgment and insight, intact recent and remote memory, average fund of knowledge, and euthymic mood; and he denied psychotic

---

[4] Because the asserted legal issues relate to Plaintiff's mental limitations, only the psychological and psychiatric evidence is summarized.

features, including hallucinations and paranoid delusions. (R. at 1134-35.) He was diagnosed with schizoaffective disorder (depressive type) and insomnia due to mental condition; both diagnoses were found to be "stable or improved". (R. at 1135.)

On July 6, 2019, Plaintiff completed a function report in which he indicated that he still lived at a homeless shelter, he had no problems caring for his personal needs, and he could clean, launder his clothes, shop for groceries, use public transportation, and manage a bank account. (R. at 370-79.) He regularly went to the library or the park, but he had trouble getting along with others, isolated himself, and was "not [as] socia[]ble as before". (R. at 374-75.) He could only pay attention for 5 minutes and had trouble completing tasks and dealing with stress, but he did "okay" with changes in routine and could follow spoken and written instructions. (R. at 375-76.)

On August 18, 2019, state agency psychological consultant (SAPC) Joel Forgus, Ph.D., performed a psychiatric review technique based on a review of Plaintiff's medical record. (R. at 110-11.) He found that Plaintiff had the nonsevere impairments of depressive, bipolar, and related disorders. (R. at 110.) He opined that Plaintiff was mildly limited in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (R. at 110-11.) He found no evidence of a medical opinion in the record. (R. at 112.) He concluded that the medical evidence of record indicated that Plaintiff's symptoms minimally limited his ability to function independently, effectively, and appropriately on a sustained basis and that his alleged severity was not supported by the medical evidence of record. (R. at 111.) On November 5, 2019, SAPC Mark Schade, Ph.D., concurred with all of SAPC Forgus's findings. (R. at 119-20.) He found no evidence of a medical opinion in the record, and he concluded that the alleged severity was not supported by the record. (R. at 120.)

On December 18, 2019, Plaintiff visited Metrocare; he reported worsening symptoms since

he had stopped taking his medication and stated that he "need[ed] to get back on" it. (R. at 1124-27.) He was alert and oriented times four, and he had logical thought content, fair judgment and insight, average fund of knowledge, intact memory, and normal attention and concentration. (R. at 1125.) He also endorsed psychosis, auditory hallucinations, and depressed and anxiety mood. (*Id.*) He was diagnosed with schizodepressive disorder. (*Id.*)

During a telephone call (due to the COVID-19 pandemic) with Metrocare on June 2, 2020, Plaintiff complained of increased symptoms since his medication had run out a month earlier. (R. at 1119-20.) On June 8, 2020, he endorsed stable mood and denied all mental health symptoms except auditory hallucinations. (R. at 1116-18.) At a follow-up on July 9, 2020, Plaintiff reported worsening paranoia and depression due to the pandemic, but he denied mood swings, changes in sleep pattern, or medication side effects. (R. at 1342-44.) He had fair insight and judgment, organized thought association, intact memory, and average fund of knowledge, but he endorsed depressed mood and paranoia. (R. at 1343.)

During a telephone call with Metrocare on September 25, 2020, Plaintiff complained of paranoia, some auditory hallucinations, and trouble sleeping, and he asked to restart his medication. (R. at 1394-96.) He was assessed as "cognitively intact" and in "good" physical health but with chronic illness, poor coping skills, nonadherence to treatment, and financial concerns. (R. at 1394.) He was alert, oriented times four, and cooperative, and he had logical thought content, average fund of knowledge, and fair insight, judgment, and impulse control, but he had depressed and anxious mood. (R. at 1395.) He was diagnosed with anxiety disorder and schizoaffective disorder; both were found to be worsening and chronic. (*Id.*) He was restarted on Zyprexa and given a one-month follow-up. (*Id.*)

In a telephonic follow-up on October 26, 2020, Plaintiff stated that his medication was

"helping [and] working" and that he was "doing well". (R. at 1402-04.) He endorsed "stable" mood and sleeping 4 to 5 hours per night. (R. at 1402.) He exhibited euthymic mood, and he denied hallucinations but endorsed paranoia. (R. at 1402-03.) He was diagnosed with schizoaffective disorder and anxiety disorder, and his medications were refilled. (*Id.*)

In a telephonic follow-up on November 30, 2020, Plaintiff reported he was still living at a homeless shelter, and he requested continued treatment. (R. at 1404-06.) He denied all psychosis symptoms and endorsed stable mood, intact memory, organized thought association, and fair attention and concentration. (R. at 1404.) His diagnosed schizoaffective disorder, insomnia due to mental condition, and anxiety disorder were stable or improved. (R. at 1406.)

Between January 2021 and June 2021, Plaintiff had four telephonic visits with Metrocare; each time, he stated that he was "doing fine", and he requested continued treatment. (R. at 1407-30.) He was still living at a homeless shelter, endorsed stable mood, denied any system symptoms, and reported medication compliance with no adverse effects, and he was found to have "maintain[ed] clinical stability". (*Id.*) His diagnoses remained the same. (*Id.*)

On September 23, 2021, Plaintiff visited Metrocare, complaining of increased symptoms and "not doing well". (R. at 1447-49.) He reported feeling angry and easily agitated; he indicated that his medications were not helping him, and he asked to adjust them. (R. at 1447.) He endorsed difficulty falling asleep, worsening depression, anhedonia, flight of ideas, racing and paranoid thoughts, and auditory hallucinations. (*Id.*) He had depressed and anxious mood and "blunted" affect, but he denied visual or command hallucinations, and his other psychiatric symptoms were negative. (*Id.*) He was assessed with schizoaffective disorder, anxiety disorder, and chronic insomnia; his medication dosages were increased and he was started on Lexapro. (R. at 1447-48.)

On September 27, 2021, Metrocare Advanced Practice Nurse Marsha M. Harris, APN,

DNP (Nurse Practitioner), completed a 3-page checkbox Functional Disability Assessment form assessing the severity of Plaintiff's four mental functions[5] on a 4-point scale. (R. at 1450-52.) She opined that Plaintiff had lost "some" ability to maintain personal appearance and to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (R. at 1450.) He had lost "substantial" ability to maintain concentration for an extended period, i.e., 2 hours. (*Id.*) She also found that Plaintiff had lost an "extreme" ability to perform the following:

1. apply commonsense understanding to carry out simple one or two-step instructions;
2. apply commonsense understanding to carry out detailed but involved written or oral instructions;
3. demonstrate reliability by maintaining regular attendance and being punctual within customary tolerances;
4. maintain attention/stay on task for an extended period, i.e., 2 hours;
5. perform at a consistent pace without an unreasonable number and length of rest period/breaks;
6. act appropriately with the general public;
7. make simple work-related decisions;
8. ask simple questions or request assistance;
9. accept instructions and respond appropriately to criticism from supervisors;
10. behave in an emotionally stable manner[6];
11. cope with normal work stress (even those inherit in low stress jobs) without exacerbating pathologically based symptoms;
12. finish a normal work week without interruption from psychologically based symptoms.

(*See* R. at 1450-51.) Nurse Practitioner's assessment also indicated that she had considered the "clinical signs of mental illness" that Plaintiff had manifested during treatment, i.e., crying spells, chronic depression, anhedonia, low energy, chronic disturbance of mood, flight of ideas, hallucinations/delusions, sleep disturbance, psychomotor agitation, and anger outbursts. (R. at

---

[5] "Work-related mental [functions] generally required by competitive, remunerative work include the abilities to: [1] understand, carry out, and remember instructions; [2] use judgment in making work-related decisions; [3] respond appropriately to supervision, co-workers and work situations; and [4] deal with changes in a routine work setting." *Shaun S. v. Berryhill*, No. 3:17-CV-1790-BN, 2018 WL 4638950, at *3 (N.D. Tex. Sept. 27, 2018) (citing SSR 96–8p, 1996 WL 374184, at *6 (S.S.A. July 2, 1996)).

[6] Nurse Practitioner rated this ability as both a "4" and a "2". (R. at 1451.)

1451.) She checked a box on the form indicating that her assessment did not conflict with her clinical findings because Plaintiff had a "residual disease process" resulting in marginal adjustment so that even a minimal increase in mental demands or change in the environment would cause him to "decompensate". (*Id.*) She opined that he would miss more than four workdays per month. (*Id.*)

## C.  November 10, 2020 Hearing

On November 10, 2020, Plaintiff and an impartial vocational expert (First VE) testified at a hearing before the ALJ.[7] (R. at 32-73.) Plaintiff was represented by an attorney. (*Id.*)

Plaintiff testified that he could not work full-time due to physical, emotional, and mental limitations. (R. at 46-51, 54-57.) He suffered from depression and had difficulty interacting with other people. (R. at 46-47, 50-51, 62-63.) He was in special education through high school and had difficulty doing math; he could read but had trouble pronouncing some words. (R. at 46, 54.) He had a history of psychiatric hospitalizations, with his last incident occurring in 2008. (R. at 57-60.) He lived in a homeless shelter. (R. at 45, 57.) He stayed busy doing crossword puzzles, coloring children's books, and playing games on his phone. (R. at 57.)

## D.  October 14, 2021 Supplemental Hearing

On October 14, 2021, Plaintiff and a second VE (Second VE) testified at a hearing before the ALJ. (R. at 74-106.) Plaintiff was represented by an attorney. (*Id.*) The ALJ found that Plaintiff had no past relevant work. (R. at 87.)[8]

---

[7] Because the ALJ's decision did not rely on First VE's testimony, it is not summarized here. (R. at 12-21.)

[8] At the outset, the attorney objected to the ALJ's denial of Plaintiff's request for additional testimony from First VE and to the use of a second VE's testimony. (R. at 79-83.) The ALJ responded:

Now, Counsel, let's address your written objection found at Exhibit 21B. On February … 9th, 2021 in a written letter, you asked me to submit your cross interrogatories to [First VE] at that time …. I read your cross interrogatories. They were very specific and involved. To avoid going back and forth using written interrogatories I decided to set a supplemental hearing. If [First VE] was scheduled to appear at the supplemental hearing you would've had an opportunity to cross examine her.

### 1. VE's Testimony

Second VE first considered a hypothetical individual with Plaintiff's age, education, work experience, and skills who could perform work at all exertional levels but who was limited to simple, routine, and repetitive tasks; low stress and no fast-paced work or strict production quotas; occasional changes in the work routine; and occasional interaction with supervisors but brief and superficial interaction with co-workers and the public. (R. at 88-89.) She opined that the individual could perform medium and unskilled (or SVP-2) work as a packer (DOT 920.587-018), with about 130,000 jobs nationally; kitchen helper (DOT 318.687-010), with about 110,000 jobs nationally; and material handler (DOT 922.687-058), with about 120,000 jobs nationally. (R. at 89-90.)

An employer's tolerance for off-task behavior was limited to no more than 10 percent of

---

I did not select the current [VE] or any of the [VEs], quite frankly. There's another section at the National Hearing Center that handles securing experts for all of my cases. I do not intend to use [First VE]'s testimony to make my decision in this case. I will use [Second VE], who is scheduled to testify at today's hearing. Your objection is duly noted and sustained at it relates to me not sending your cross interrogatories to [First VE]. My remedy is to offer a new [VE] who is about to testify in today's hearing. …
…
I understand your argument, Counsel. And my position, I understand you wanting to cross examine [First VE]. She's not here. And the VE who is scheduled is available and we will be calling him. I intend to strike the testimony from [First VE] and all the interrogatories and all of the responses to the interrogatories from the record. I intend to take testimony from a VE who is here today.

I believe when I weigh how much time it is going to take for me to yet [sic] send cross interrogatories to [First VE] and her getting back to me with trying to resolve the issue that's at hand, when we have a perfectly fine VE who can testify. I don't think there's anything special about [First VE]'s qualifications other than the fact that she was the first VE who was selected randomly for this hearing.
…
But at this point, Counsel, I'm going to look at the evidence, because we've had additional evidence that was added to the file. … I will admit all of those exhibits into evidence at this time and will strike the evidence that relates to the first vocational expert on this, [First VE], any of the interrogatories, both interrogatories that were sent by me and the cross interrogatories that were sent by [Plaintiff's attorney].
…
Now, the fact that I'm striking them, I'm going to leave them in the record in the event that coun[se]l decides to appeal because the appellate courts will need to see what it is that we're talking about, but I will not consider it for my hearing. So whatever striking means for that purpose it'll still be a part of the record so that the appellate authorities will have an opportunity to see what exactly was submitted. But I'm not going to consider [First VE]'s testimony. I have [Second VE] who is waiting to have his testimony taken.

(R. at 80-84.) Plaintiff's attorney clarified that he did not object to Second VE's qualifications and that he merely argued that Second VE should not be the expert testifying. (R. at 81, 84, 87.)

the workday outside regular breaks, i.e., two 15-minute rest periods and a 30-minute meal period. (R. at 93.) An employer's tolerance for absenteeism initially "[a]fter the onset of symptoms" was 1 or 2 days per month; continued absences "month after month" would preclude work, however. (R. at 93, 98.) His opinions were based on his professional experience as a "resource". (R. at 93.)

On cross-examination, Second VE opined that there would be jobs that could be performed by an individual who could not maintain concentration for two hours. (R. at 93-94.) In considering whether such an individual could perform the identified jobs, Second VE opined that some jobs could be performed "at the worker's pace" and would not be limited to a strict two-hour work block, even if the 10 percent off-task threshold and the absentee rate still applied. (R. at 94-95.) He further opined that there would be no work for an individual lacking any of the abilities to:

1. make simple work-related decisions;
2. ask simple questions or request assistance;
3. accept instructions and respond appropriately to criticism from supervisor;
4. get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;
5. cope with normal work stress, even those inherent in low stress jobs without exacerbating pathologically based symptoms; and
6. finish a normal work week without interruption from psychologically based symptoms.

(R. at 96-98.) Issues relating to periods of hospitalizations, grooming, and wardrobe varied from case to case, and a criminal record or sex offender status would not preclude the identified jobs. (R. at 98-100.)

Second VE's testimony was consistent with the DOT, its companion publication (Selected Characteristics of Occupations), and the agency's exertional levels of work. (R. at 87.)

### 2. *Plaintiff's Testimony*

Plaintiff testified that instead of a homeless shelter, he now slept at a dog park or sometimes at his mother's house. (R. at 102, 104.) He endorsed symptoms of depression and paranoia; he cried once a week, isolated himself, and used the computer at the library. (R. at 103.)

### E.  ALJ's Findings

The ALJ issued an unfavorable decision on November 26, 2021. (R. at 13-22.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since his application date of June 12, 2019. (R. at 16.) At step two, she found the severe impairments of depression, insomnia, and anxiety, as well as the non-severe impairment of an ankle condition. (*Id.*) Despite those impairments, the ALJ found at step three that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.*) She explicitly considered Listings 12.04 and 12.06. (*Id.*)

Next, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, except he had the following nonexertional limitations:

> [He] can perform simple, routine, and repetitive tasks. [He] requires a low-stress work environment without fast-paced work or strict production quotas. [He] can tolerate only occasional changes in work routine. [He] can have occasional interaction with supervisors, but only brief, superficial interaction with co-workers and the public.

(R. at 18.) At step four, she found that Plaintiff had no past relevant work. (R. at 21.) At step five, she found that considering Plaintiff's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he could perform. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since June 12, 2019, the date he filed his application. (R. at 22.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

10

reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff raises two issues for review:

1. The ALJ obtained testimony from First VE. Subsequent to the hearing, she submitted written interrogatories to First VE and obtained a response. The ALJ proffered such interrogatories to Plaintiff's attorney. By way of cross-examination, the attorney submitted additional interrogatories to the ALJ to be answered by First VE, but the ALJ

refused to submit the interrogatories. Instead, the ALJ called a supplemental hearing with a different VE. The ALJ advised Plaintiff's attorney that she would strike the interrogatories received from First VE, but she failed to do so and they remain a part of the exhibit file. Did the ALJ violate Plaintiff's right to due process by refusing to allow cross-examination of First VE, while retaining her answers to interrogatories as exhibits?

Plaintiff argues that the answer is "Yes."

2.  The ALJ found that Plaintiff has severe mental impairments. She rejected the opinions of the SAMCs, who found that Plaintiff's mental impairments are not severe; and the ALJ rejected the opinion of Plaintiff's treating Nurse Practitioner as to Plaintiff's functional limitations resulting from his severe mental impairments. Instead, the ALJ crafted her own estimate of Plaintiff's functional abilities but referred to no evidence in support of her opinion. Did the ALJ properly determine Plaintiff's RFC by substituting her own medical judgment for the opinion of the treating Nurse Practitioner?

Plaintiff contends that the answer is "No."

(doc. 16 at 2-3) (cleaned up).

## A.  <u>Due Process</u>

Plaintiff contends that the ALJ denied him due process by refusing to send his cross-interrogatories to First VE. (doc. 16 at 4-6) (citing HALLEX I-2-5-58(B)).

"The regulations do not require the use of the formal rules of evidence at an administrative hearing." *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995). Nonetheless, the claimant is entitled to due process. *See Bayer v. Colvin*, 557 F. App'x 280, 286 (5th Cir. 2014); *Norden v. Barnhart*, 77 F. App'x 221, 223 (5th Cir. 2003). The Fifth Circuit has held that social security claimants enjoy due process guarantees, including the right to cross-examine medical consultants, vocational experts, and examining physicians. *See Barrett v. Berryhill*, 906 F.3d 340, 344 (5th Cir. 2018), *as revised* (Oct. 16, 2018) (medical consultants); *Tanner v. Sec. of Health and Hum. Svcs.*, 932 F.2d 1110, 1111 (5th Cir. 1991) (vocational experts); *Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990) (examining physicians). That right is not unlimited, however. For example,

HALLEX[9] provides that the claimant and his representative have the right to examine the VE "fully on any pertinent manner within the VE's areas of expertise", but it also states that the claimant's right to examination is within the ALJ's discretion. *See* HALLEX I-2-6-74(C) (stating that the ALJ "will determine when [claimants] may exercise this [due process] right and whether questions asked or answers given are appropriate"); *see also*, *e.g.*, *Barrett*, 906 F.3d at 344 (finding that the claimant did not have due process right to cross-examine the SAMC, because among other reasons, "allowing [additional] questioning may more often result in delay than the discovery of useful evidence"); *Vaughan*, 58 F.3d at 132 (rejecting claimant's argument that she was denied a full and fair hearing based on the ALJ's allegedly leading questions, misstatements regarding her conditions, and refusal to allow full cross-examination and access to the VE's notes because the ALJ had "allowed counsel to cross-examine the [VE] extensively"); *Bayer*, 557 F. App'x at 286 (holding that the ALJ did not err in denying the claimant's request to submit a hypothetical to the VE where the claimant had the opportunity to cross-examine the VE at the hearing); 5 U.S.C. § 556(d) (requiring under the Administrative Procedure Act only "such cross-examination as may be required for a full and true disclosure of the facts"). The claimant bears the burden of demonstrating the ALJ's bias and overcoming the presumption that the ALJ is fair and unbiased. *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982); *see Liteky v. United States*, 510 U.S. 540, 551 (1994) (finding that a party claiming bias must show that the ALJ was wholly unable to issue a fair decision).

---

[9] HALLEX, the agency's Hearings, Appeals and Litigation Law manual, "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council and Civil Actions levels." HALLEX I-1-0-1. Although HALLEX "does not carry the authority of law", the agency must follow its own procedures where they affect the rights of individuals. *Morgan v. Colvin*, 803 F.3d 773, 777 (5th Cir. 2015) (quoting *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000)). "[I]f prejudice results from a violation, the result cannot stand." *Id.* (quoting *Newton*, 209 F.3d at 459). "Prejudice can be established by showing that the additional considerations might have led to a different decision." *Mettlen v. Barnhart*, 88 F. App'x 793, at *1 (5th Cir. 2004) (unpublished) (quoting *Newton*, 209 F.3d at 458).

Here, the ALJ submitted interrogatories to First VE after the first hearing, and she proffered First VE's responses to Plaintiff, whose counsel submitted cross-interrogatories for First VE. (R. at 13.) Over Plaintiff's objections, the ALJ did not submit his cross-interrogatories to First VE; she instead scheduled a supplemental hearing with a second VE, who was selected by an entity that scheduled all expert witnesses for her cases. (R. at 13, 80-83, 261-62.) The ALJ specifically addressed Plaintiff's objections at the supplemental hearing and in her decision, and she provided a thorough explanation for her rulings. (R. at 13, 80-83.) For example, she noted that Plaintiff's cross-interrogatories were "very specific and involved", so she set a supplemental hearing "to avoid going back and forth using written interrogatories". (*Id.*) While she sustained Plaintiff's objection to her refusal to submit Plaintiff's cross-interrogatories, she offered and implemented a remedy, which consisted of striking and not relying on First VE's testimony, relying solely on Second VE's testimony, and leaving in the record First VE's testimony and the related interrogatories solely for purposes of appeal. (*Id.*) The ALJ also explained that First VE was not especially qualified other than that she was the first expert selected, Plaintiff's testimony at both hearings would still be relied upon, she would base her decision on all of the evidence, including that submitted since the first hearing, and the agency had already entered into a contract with Second VE's employer for his testimony that day. (*Id.*) The ALJ's conduct in refusing to seek additional testimony from First VE in lieu of a supplemental hearing with a second VE, which she found to be more "expeditious[]" in resolving Plaintiff's case, does not demonstrate any bias; it instead shows an effort to be efficient. (R. at 13, 21-22, 80-83); *see Barrett* 906 F.3d at 344; 5 U.S.C. § 556(d).

Moreover, Plaintiff's argument is legally and factually deficient. He cites no authority for finding that the ALJ's refusal to submit his cross-interrogatories to First VE was per se improper

or prejudicial to warrant remand. (doc. 16). Even if the ALJ violated HALLEX I-2-5-58(B)[10] by denying Plaintiff's request to submit his cross-interrogatories to First VE, he does not present any evidence that could or would have been adduced from First VE's responses to his cross-interrogatories that would have led to a different result in the case. *See generally Lindsey v. Comm'r of Soc. Sec. Admin.*, No. 2:08-CV-233-WAP-DAS, 2009 WL 4738168, at *6 (N.D. Miss. Dec. 4, 2009) (finding that HALLEX violation did not prejudice the claimant where he failed to proffer any evidence that would have been produced to change the outcome of the case).

Plaintiff also argues that the ALJ erred by leaving First VE's testimony as an exhibit in the administrative record, making it "procedurally defective" and prejudicial. (doc. 16 at 6.) His argument disregards the hearing transcript, however. First, the ALJ specifically stated during the supplemental hearing that First VE's testimony was stricken and that she would not rely on it, but that it would remain a part of the record for appellate purposes only. (R. at 83-84.) Second, Plaintiff does not argue, much less show, that the ALJ relied on any portion of First VE's testimony, thereby prejudicing him. (doc. 16.) Finally, Plaintiff fails to cite any authority for the finding that the inclusion of stricken exhibits in a record makes it "procedurally defective", warranting remand. (*Id.*) Despite his objections, Plaintiff avers that First VE's testimony "cannot be removed from the Transcript of administrative proceedings" and that "ALJs certainly have the right to determine what is, and what is not, admissible as documentary evidence". (*Id.* at 6.)

---

[10] HALLEX outlines the required treatment of interrogatories to VEs:

> An ALJ must rule on any objection or request by the claimant regarding the VE's response to the interrogatories. The ALJ may rule on an objection on the record during the hearing or in a writing that the ALJ exhibits and associates with the record. Even if the claimant or any appointed representative previously had the opportunity to do so, an ALJ must allow a claimant to propose additional interrogatories to the VE or request a supplemental hearing to question the VE.

HALLEX I-2-5-58(B) (requiring that the ALJ decision "include the rationale for ruling against any objection").

Plaintiff has failed to meet his burden to show that the ALJ's actions are evidence of bias, much less of a level of bias showing that the ALJ was unable to issue a fair decision. *See Schweiker*, 456 U.S. at 195-96); *Liteky*, 510 U.S. at 551. Remand is not required on this issue.

## B.  **Ripley Error**

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ had failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *See* 67 F.3d at 552. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the Fifth Circuit found that the ALJ's RFC determination was not supported by substantial evidence and remanded the case with instructions to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003).

Here, the ALJ found after "careful consideration" of the entire record that Plaintiff had the RFC to perform a full range of work at all exertional levels, but he was limited to simple, routine, and repetitive tasks, a low-stress work environment without fast-paced work or strict production

quotas, only occasional changes in work routine, and occasional interaction with supervisors, but only brief, superficial interaction with co-workers and the public. (R. at 18.)

In determining Plaintiff's RFC, the ALJ first considered his hearing testimony. (R. at 19.) She noted that he had testified at the first hearing that he could not work full-time due to physical, emotional, and mental limitations, he suffered from depression, and he had trouble with social interactions. (*Id.*) She also considered his ability to read, his special education, and his difficulty doing math and pronouncing some words. (*Id.*) She noted his past psychiatric hospitalizations, homelessness, and hobby of puzzles and games. (*Id.*) She considered his testimony at the supplemental hearing that he slept in a dog park or at his mother's house, experienced depression, paranoia, and isolation, and used the computer at the library. (*Id.*) The ALJ also considered Plaintiff's July 2019 function report, which reported his ability to care for his personal needs, clean, wash his clothes, shop for groceries, and go to the library. (*Id.*) She noted he could deal with changes in routine and follow instructions, but he had trouble getting along with others, maintaining attention, handling stress, and completing tasks. (*Id.*)

The ALJ further considered the objective medical evidence, especially the Metrocare treatment notes between May 2019 and June 2021; she noted his various "missed" appointments, "poor compliance", and "gaps" in treatment between May 2019 and September 2020. (R. at 19-20.)  She also noted he reported auditory hallucinations in March 2020. (*Id.*) The ALJ noted that Plaintiff endorsed stable mood and denied psychosis symptoms from October 2020 and June 2021. (R. at 20.) She found that he reported increased symptoms and that his medication dosages were adjusted in September 2021.[11] (*Id.*) None of this medical evidence addressed the effects of these

---

[11] The ALJ noted that Plaintiff "did not exhibit any psychotic symptoms" in his September 2021 visit; the record shows that he endorsed depressed and anxious mood, blunted affect, paranoia, and "signs of psychotic features". (*Compare* R. at 20, *with* R. at 1447.)

18

conditions on his ability to work, however. *See Browning*, 2003 WL 1831112, at *7 (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could not rely on "raw medical evidence as substantial support for" the claimant's RFC); *see also Turner v. Colvin*, No. 3:13-CV-1458-B, 2014 WL 4555657, at *5 (N.D. Tex. Sept. 12, 2014) ("[E]vidence which merely describes Plaintiff's medical conditions is insufficient to support the ALJ's RFC determination.") (citation omitted).

The ALJ also considered the SAPCs' August 2019 and November 2019 opinions. (R. at 20.) They found that Plaintiff had mild limitations in the four areas of mental function and that the alleged severity was not supported by the medical evidence of record. (*Id.*) The ALJ found these opinions "not persuasive" because the SAPCs did not review evidence received at the hearing level, which demonstrated "consistent" mental health treatment and that supported finding "severe" mental impairments. (*Id.*) While the ALJ may choose to reject the opinions of the SAPCs, "[s]he cannot independently decide the effects of Plaintiff's … impairments on his ability to work, as that is expressly prohibited by *Ripley*", however. *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013) (finding the ALJ erred by rejecting the doctor's opinion regarding plaintiff's limitations from mental impairments and independently decided that plaintiff could perform simple, unskilled work).

The ALJ further considered Nurse Practitioner's September 2021 Functional Disability Assessment that indicated disabling mental health limitations, including that Plaintiff had "extreme" limitations in most of the activities of mental functions and that he would miss more

than four workdays per month. (R. at 20.) The ALJ found that Nurse Practitioner's assessment was "not persuasive" based on the following:

> First, it is not supported by any records indicating that [Nurse Practitioner] provided mental health care for [Plaintiff]. Moreover, it is not consistent with treatment records from [Plaintiff]'s mental health clinician. As noted above, the medical evidence since the application date demonstrates only routine medication management. In most of the appointments discussed above, [Plaintiff] has reported stable mood and denied significant symptoms. Likewise, examinations have not revealed significant abnormal objective findings.

(*Id.*) The ALJ specifically cited Plaintiff's Metrocare treatment notes. (*Id.*) Despite Plaintiff's longitudinal treatment by Metrocare, indicating various mental status examinations indicating "stable" mood despite three consistent mental diagnoses, the ALJ could not rely solely on those records to derive Plaintiff's RFC. *See Ripley*, 67 F.3d at 552 (finding that a record containing "a vast amount of medical evidence" establishing that the claimant had an impairment did not "*clearly*" establish the effect of that impairment on his ability to work) (emphasis added); *see also Connie C. v. Berryhill*, No. 5:18-CV-169-BQ, 2019 WL 2516727, at *7 (N.D. Tex. May 30, 2019) (concluding that there were no medical opinions to support the ALJ's decision because various examinations "outlined some of Plaintiff's mental problems" but did not include a statement on the effects of her generalized anxiety disorder, major depressive disorder, and somatic symptom disorder on her ability to work), *report and recommendation adopted*, No. 5:18-CV-0169-C-BQ, 2019 WL 2515188 (N.D. Tex. June 18, 2019).

The ALJ identifies no medical opinion in the record regarding the effects of Plaintiff's mental impairments on his ability to work, particularly in the areas of simple, routine, and repetitive tasks, persisting and maintaining pace, interactions with others, and adapting and managing oneself. She appears to have relied on her own interpretation of the medical and other evidence, which she may not do. (R. at 18); *see Salmond v. Berryhill*, 892 F.3d 812, 818 (5th Cir.

20

2018) (stating that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability") (citation omitted); *Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("An ALJ may not— without the opinions from medical experts—derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *see also Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination); *Davis v. Astrue*, No. 1:11-CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012) ("In formulating a claimant's RFC, the ALJ—a layperson—may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013).

The Commissioner argues that Plaintiff's "suggestion" that the ALJ's RFC finding must be based on a medical opinion is "inherently" contrary to the "new regulatory framework".[12] (doc. 18 at 9.) No authority is cited to support that argument, however. (*Id.*); *compare* 20 C.F.R. § 404.1520c, *with Salmond*, 892 F.3d at 818, *and Williams*, 355 F. App'x at 832 n.6. The Commissioner cites *Webster v. Kijakazi*, 19 F.4th 715, 718-19 (5th Cir. 2021), in which the ALJ specifically found persuasive a medical consultant assessment and incorporated its findings into the claimant's RFC. By contrast, the ALJ here rejected three medical opinions in the record and relied on none in determining Plaintiff's RFC. (R. at 12-21); *see Ripley*, 67 F.3d at 552. Accordingly, substantial evidence does not support the RFC determination. *See Geason v. Colvin*,

---

[12] The Commissioner references the Administration's updated rules on the treatment of medical opinion evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, like here, the rule that treating sources be given controlling weight was eliminated. (R. at 318); *see Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a)) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)").

No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments).

## C. **Harmless Error**

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, he must show that the ALJ's failure to rely on a medical opinion as to the effects that his impairments had on his ability to work casts doubt onto the existence of substantial evidence supporting the disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. Mar. 6, 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's failure to rely on a medical opinion regarding Plaintiff's mental RFC casts

doubts as to whether substantial evidence exists to support the finding that he is not disabled or that he can perform the jobs that the VE identified. *See Martinez v. Kijakazi*, No. 3:20-CV-3282-BH, 2022 WL 4590577, at *21 (N.D. Tex. Sept. 29, 2022) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ failed to rely on a medical opinion in determining the plaintiff's RFC); *Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (same); *Thornhill v. Colvin*, No. 3:14-CV-335-M, 2015 WL 232844, at *11 (N.D. Tex. Jan. 16, 2015), at *11 (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"). Accordingly, the error is not harmless, and remand is required on this issue.

## IV.    RECOMMENDATION

The Commissioner's decision should be **REVERSED** and the case **REMANDED** for further administrative proceedings.

**SO RECOMMENDED** on this 28th day of June, 2023.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE